## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| _____ | : | |
| **UNITED STATES SECURITIES** | : | |
| **AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CASE NO. 19-cv-28** |
| **v.** | : | |
| | : | |
| **KEVIN R. KUHNASH, and** | : | |
| **JASON  P. JIMERSON,** | : | **JURY DEMANDED** |
| | : | |
| **Defendants.** | : | |
| | : | |
| _____ | : | |

## <u>COMPLAINT</u>

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows:

1.      This case centers on a fraudulent scheme perpetrated by Defendants Kevin Kuhnash and Jason Jimerson – respectively the former Chief Executive Officer and former Chief Operations Officer of an Indiana-based plastics manufacturing company called Lucent Polymers, Inc. ("Lucent"). Their scheme was simple. They aimed to sell the company – including their own substantial equity stake – while hiding from potential buyers the fact that Lucent's core business model was a sham.

2.      Like a modern-day Rumpelstiltskin, Lucent claimed that it could transform "garbage to gold." Lucent promised customers that – unlike its competitors – it could process less expensive, recycled and scrap material and turn it into high quality bulk plastics that met stringent standards on critical features like flame resistance and tensile strength. By

using cheaper "garbage" to create purportedly high-quality plastics, Lucent could offer its products at a much lower price than competitors and "slay the market leaders … at will."

3.    Lucent's near-magic "garbage to gold" process was a huge commercial success. Between 2007 and 2013, Lucent's revenue almost doubled. And, predictably, Lucent's purported ability to create profitable plastics from "garbage" generated interest from investors. In September 2013, Lucent – with Kuhnash and Jimerson at the helm – started to court potential buyers.

4.    Unfortunately, Lucent's business model was a fraud and Defendants Kuhnash and Jimerson knew it. Lucent could not reliably turn recycled "garbage" into products that met customers' high standards. In reality, Lucent's plastics routinely flunked its own internal performance tests. Plastics that were supposed to be impact resistant were too brittle. Purportedly flame resistant products caught fire for too long or melted too easily. Rather than tell customers the truth, Lucent routinely sent them fake test results to fool them into thinking that Lucent's products passed muster. Lucent also routinely evaded third-party safety standards so it could tout its products' performance while using cheaper non-compliant formulas.

5.    No later than September 2013, both Kuhnash and Jimerson knew that the "garbage to gold" business model was a sham. In fact, Kuhnash and Jimerson knew that Lucent's own Technical Director – in charge of developing Lucent's plastic formulas – was "greatly troubled" by widespread "dishonesty" at the heart of Lucent's business, including manipulation of test data, and evasion of third-party safety standards.

6.    When they learned of the deception at Lucent, Kuhnash and Jimerson could have come clean or delayed their efforts to sell the company. Instead, they continued to

market Lucent to potential buyers and engaged in a fraudulent scheme to hide the "garbage to gold" fraud so that they could maximize the value of their Lucent stock. To perpetuate the scheme, Kuhnash and Jimerson, among other things, lied to prospective investors, gave misleading marketing presentations, submitted false information to auditors, and permitted Lucent to continue to send false product information to customers and lie to third-party product inspectors.

7.      The scheme worked. With Defendants' help, Lucent was sold twice in rapid succession. In December 2013, Lucent was sold to another plastics company called Citadel Plastics Holdings, LLC. While they hid the fraud at Lucent's core, Jimerson and Kuhnash cashed in a portion of their equity stake in Lucent for combined payments of over $538,000.

8.      But, the scheme did not end in December 2013. Kuhnash and Jimerson had two reasons to continue their fraud. First, they were due significant amounts from the first sale – over $175,000 combined – that were being held in escrow. If Lucent's fraud came to light, those escrow payments could have been stopped. Second, Kuhnash and Jimerson still held a portion of their equity stake that had been converted to Citadel stock. Before they completed the first sale, Kuhnash and Jimerson already had their eyes on a second one – which they called the "next liquidating event."

9.      In this "next liquidating event," the scheme ultimately ensnared a public company. Kuhnash and Jimerson continued to hide the "garbage to gold" fraud and, on June 1, 2015, Citadel/Lucent was sold to Company 1 (a publicly traded competitor). Once again, Kuhnash and Jimerson profited from their cover-up scheme. In this second sale, they liquidated their remaining equity stake for over $1.3 million.

10.     Even after Company 1 discovered Citadel/Lucent's deceptive business practices, Kuhnash and Jimerson continued to hide their involvement. After Company 1 sued him and others, Jimerson repeatedly lied under oath, falsely denying any prior knowledge of Lucent's fraud. Meanwhile, during the SEC's investigation of his conduct, Kuhnash refused to answer any substantive questions and asserted his Fifth Amendment privilege against self-incrimination.

11.     By making material misrepresentations to Lucent's buyers, and by scheming to hide Lucent's widespread fraudulent practices so they could sell their stock at an inflated price, Kuhnash and Jimerson committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

## JURISDICTION AND VENUE

12.     The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)], and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 78u(d) and 78u(e)].

13.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

14.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business underlying the alleged violations occurred within the jurisdiction of the United States District Court for the Southern District of Indiana.

15.     During the alleged fraud described below, Defendant Jimerson was a resident of Evansville, Indiana and Defendant Kuhnash resided part-time in Evansville, Indiana.

Both Defendants were officers of Lucent and worked out of Lucent's Evansville, Indiana headquarters.

16.    Defendants directly and indirectly used the means and instruments of transportation and communication in interstate commerce in connection with the acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

17.    **Kevin R. Kuhnash,** age 56, currently resides in Springboro, Ohio. At the time of the conduct alleged below, Kuhnash lived part-time in Evansville, Indiana and part-time in Cincinnati, Ohio. From approximately 2008 to December 2013, Kuhnash was the President and Chief Executive Officer ("CEO") of Lucent.  After Lucent was sold in December 2013, Kuhnash helped integrate Lucent's business operations into Citadel, and then left the company in February 2014.

18.    **Jason P. Jimerson**, age 44, resides in Killen, Alabama. At the time of the conduct described below, Jimerson resided in Evansville, Indiana. From July 2012 to December 2013, Jimerson was Lucent's Chief Operating Officer ("COO"). From December 2013 through September 2014, Jimerson helped integrate Lucent into Citadel. Starting in October 2014, Jimerson served as Citadel's Vice President of Thermoplastics. Jimerson served in that role until he was fired in December 2015 after Citadel's purchaser discovered the "garbage to gold" fraud.

## RELATED PARTIES

19.    **Lucent Polymers, Inc.** was a privately held plastics manufacturing company incorporated in Delaware and headquartered in Evansville, Indiana.

20.    **The Matrixx Group, Inc.** was a privately held plastics manufacturing company incorporated in Indiana and headquartered in Evansville, Indiana. Matrixx was a wholly-owned subsidiary of Citadel Plastics Holdings, LLC. In December 2013, Matrixx acquired Lucent by buying all of its stock. The sale of Lucent to Matrixx was memorialized in a December 6, 2013 stock purchase agreement (the "SPA").

21.    **Citadel Plastics Holdings, LLC** was a privately held plastics manufacturer incorporated in Delaware and headquartered in West Chicago, Illinois. Matrixx was a wholly-owned subsidiary of Citadel when it executed the SPA and bought Lucent. This Complaint refers to this entity as "Citadel" before its December 6, 2013 purchase of Lucent and as "Citadel/Lucent" after the purchase.

22.    **"Company 1"** is a publicly traded Delaware corporation that manufactures plastic compounds and resins. In June 2015, Company 1 acquired Citadel/Lucent by buying all of its outstanding stock.

## FACTS

### Lucent's Fraudulent "Garbage to Gold" Business Model

23.    Defendants Kuhnash and Jimerson were respectively the CEO and COO of Lucent – a plastic "compounder." "Compounders" like Lucent sell bulk plastics – in the form of small plastic pellets – to "molders" who then melt and mold the pellets into plastic parts. From there, parts made from Lucent's compounds were incorporated into a broad array of consumer products including automobiles, air conditioners, furnaces, and ceiling fans.

24.    In manufacturing its bulk plastic pellets, Lucent had to meet certain specifications on characteristics like color, strength, impact resistance, and flame resistance.

25.     Those specifications generally came from two sources. First, Lucent's customers – the plastic "molders" – typically specified the performance characteristics that they needed. Often, the customer's specifications directly related to the safety features of the customer's end product. For example, one of Lucent's customers built plastic facie for automobile bumpers and, therefore, specified that Lucent's compound meet certain thresholds for impact resistance. Another customer built plastic parts for furnaces and required that Lucent provide a compound with a certain level of flame resistance.

26.     Second, many of Lucent's products were registered with Underwriters Laboratories ("UL") – an independent safety consulting and certification company that established safety standards for plastic materials and other products. UL-registered products had to survive rigorous testing before being certified.

27.     Often, to meet the stringent standards of customers and UL, plastic compounders must use higher quality (and thus more expensive) inputs. This increases the compounder's manufacturing costs and ultimately increases the price the compounder must charge its customers.

28.     Lucent claimed to have a found a way around this problem.  Pursuant to its "garbage to gold" business model, Lucent claimed that it could use less expensive, non-prime materials – like recycled materials and post-industrial scrap – and still produce high quality plastic compounds that met all required customer and UL specifications. By using less expensive inputs than its competitors, Lucent could offer the same high quality plastics at much lower prices.

29.     Lucent's products – purportedly high quality plastics at a lower cost – were a huge commercial success. From 2007 to 2013, Lucent's revenue nearly doubled from $42.4

million to $80.6 million. During that same period – even while it routinely undercut the competition on price – Lucent enjoyed gross profit margins of over 20% per year.

30.     In a September 2013 presentation to prospective investors, Lucent boasted that its ability to turn low cost materials into high performing compounds "is the essence of our secret sauce that allows us to slay the market leaders, practically at will."

31.     In reality, Lucent's actual "secret sauce" was fraud. Lucent could not reliably transform cheap, non-prime materials into high quality plastics that met customer requirements. Rather, Lucent's routine business practice was to sell non-conforming product to its customers and send those customers fake lab results to fool them into believing that its product met specifications.

32.     Lucent deceived its customers in two ways: (a) it sent certificates-of-analysis ("COAs") to customers that falsely certified that Lucent's products met customer requirements, and (b) it circumvented UL's registration and audit procedures to fool customers into thinking that Lucent's products met UL specifications. As of September 2013, these fraudulent business practices were pervasive and were well-known within Lucent, from lower-level employees to the highest-ranking executives, including Kuhnash and Jimerson.

     1.   <u>Lucent Reported False Test Results on COAs Sent to Customers</u>

33.     Typically, when a customer ordered plastic from Lucent, that customer would identify its required specifications. Before shipping, Lucent typically tested each product batch on site at its production facility. Depending on the characteristics demanded by the customer, Lucent's testing regime could include a variety of performance tests, including a melt-flow test (to measure how easily Lucent's compound melted and flowed into a mold),

an impact test (to measure the plastic's durability), and/or a flame test (measuring the plastic's flame retardant properties). In most cases, Lucent performed the tests correctly and – at least on their internal records – accurately recorded the results.

34.     The problem for Lucent was that its accurate, internal lab records routinely showed that its products did not test within the performance thresholds demanded by its customers.

35.     When Lucent's internal tests revealed that its compound fell short of customer specifications, Lucent could have fixed the problem in several ways. For example, Lucent could have reformulated the product so that it met the customer's standards. Or, Lucent could have asked the customer if it would accept a product that did not meet the requested specifications. Lucent did neither. Instead, Lucent lied to its customers. When a product failed one or more applicable tests, Lucent employees sent the customer a COA falsely stating that the product met all required specifications.

36.     Between December 2010 and December 2013, the vast majority of COAs Lucent sent to customers contained falsified test results. Lucent employees varied the fabricated data to avoid suspicion and routinely deceived customers who raised questions about products.

37.     Lucent conducted this fraud even when it posed a potential safety risk. For example, Lucent claimed that it could manufacture a clear, flame retardant compound. Such a product was attractive to customers because it could be used to manufacture see-through plastic covers for electrical boxes and other applications that required transparency and flame retardant properties. But, when Lucent tried to make this compound, it discovered that the flame retardant additive caused the product to appear opaque – a

problem that would have been obvious to the customer. Lucent "solved" this problem by removing flame retardant from the product's formula and falsifying the flame test results on COAs sent to customers. As a result, Lucent's customers unwittingly bought purportedly flame retardant plastic that, in reality, had no flame retardant properties.

38.    Falsification of COAs to perpetuate the "garbage to gold" fraud was the standard operating procedure at Lucent. This fraudulent practice was well known within Lucent. Discrepancies between internal test results and COAs were discussed regularly at weekly quality meetings, some of which were attended by Jimerson.

39.    As shown below, both Kuhnash and Jimerson knew about Lucent's routine falsification of COAs at the time they were marketing Lucent to potential buyers.

   2.   Lucent Circumvented Underwriters Laboratories's Registration and Audit Procedures

40.    UL tests and certifies consumer products to ensure that they meet certain performance and safety standards. Qualifying products receive a "UL" label that adorns a broad array of household goods from stereo equipment to coffee makers. Many manufacturers seek the "UL" label so they can emphasize the safety characteristics of their product. To get that coveted "UL" label, manufacturers demand materials – including plastics – that have been registered with UL. To meet that customer demand, Lucent offered multiple UL-registered products. But, rather than meeting UL's standards on the merits, Lucent often obtained UL registration by circumventing UL's testing and auditing processes.

41.    By September 2013, Lucent was circumventing UL's processes in three ways. First, Lucent often changed the formula of its UL-registered products without notifying UL. To prevent cheating, UL uses infra-red spectography and other tools to record a molecular

10

"fingerprint" of the samples supplied by compounders like Lucent. This "fingerprint" ensures that the compounder does not try to game the system by changing the product's formula after a successful test. If the compounder changes its formula, it must notify UL so that a new round of testing can be performed. Lucent repeatedly shirked that obligation. It often changed a product's formula without providing the required notice. Thus, Lucent could base the product's registration on a prior, successful test for the original formula but save money by adopting a new formula with less expensive inputs.

42.     Second, for products containing recycled inputs, Lucent falsely registered the product with UL as containing "prime" materials. In general, recycled inputs create more variation in the end-product. UL, therefore, put products made with recycled inputs through a more stringent testing and disclosure process. By falsely registering its products as containing prime materials, Lucent saved money and avoided additional questions and procedures that could have uncovered its deception.

43.     Third, Lucent circumvented UL's audit process. In addition to registering new products, UL regularly audits existing registered products. UL field representatives visit manufacturing facilities and subject product samples to further testing and comparison to the original molecular "fingerprint" on file. Lucent avoided that process by giving auditors old, conforming samples rather than samples from current production runs as required by UL. This ensured that the old sample would match the molecular "fingerprint" on file with UL while the new formula being sold to customers escaped scrutiny.

44.     Lucent's evasion of the UL certification process was well known within Lucent. Lucent's use of old product samples to fool UL was so common that Lucent employees had a name for it; they referred to this practice as grabbing a sample from the

"box on the shelf." As shown below, both Kuhnash and Jimerson knew about Lucent's routine evasion of UL procedures at the time they marketed Lucent to potential buyers.

**Kuhnash and Jimerson Knew About Lucent's Fraud When They Were Marketing Lucent to Potential Buyers**

45.     Starting in September 2013, Kuhnash and Jimerson engaged in a fraudulent scheme to market and sell their ownership stake in Lucent while hiding the pervasive fraud at the company.

46.     By September 2013, Lucent was actively soliciting acquirers and was conducting marketing pitches, leading walk-throughs of Lucent facilities, and facilitating the due diligence processes of prospective buyers. Kuhnash and Jimerson were actively involved in marketing the potential sale. Among other things, Kuhnash and Jimerson each helped create presentation materials provided to potential buyers, participated in meetings with those potential buyers during which Lucent's manufacturing capabilities and financial results were touted, and supervised responses to due diligence inquiries.

47.     Kuhnash and Jimerson had a personal financial interest in the successful sale of Lucent. As of September 2013, each of them owned an equity stake in the company. At the time, Jimerson owned 1.3 million Lucent shares while Kuhnash held over 8.1 million shares (the largest stake of common stock for any individual shareholder).

48.     No later than September 2013 – at the same time as they were marketing Lucent to potential buyers – both Kuhnash and Jimerson knew that that Lucent was manipulating test data, providing false information to customers in COAs, circumventing the UL registration and auditing processes, and responding to customer inquiries with deceptive stories designed to hide the source of product deficiencies. In sum, Kuhnash and

Jimerson knew that Lucent could not reliably meet customer and UL standards while using cheaper, recycled inputs.

49.     Kuhnash and Jimerson's knowledge of the "garbage to gold" fraud is reflected in a series of emails in late September 2013 that started when Lucent's Technical Director – in charge of developing the formulas for Lucent's plastics – informed Kuhnash about widespread "dishonesty" at the company.

50.     On September 19, 2013 – while Lucent was soliciting buyers for the company – Lucent's Technical Director sent an email warning Kuhnash about (a) Lucent's evasion of UL requirements, (b) the manipulation of performance test data, and (c) deceptive responses to customer complaints:

---

Kevin,

I know that you have approximately one million things going on right now; however I feel you are the only person who will understand what I am going to say. This should probably go to Jason, but I don't know if he would understand this like you would. I would prefer this were discussed in person as well, but I know how busy you are.

I am having some ethical/conscience issues here. There is a level of dishonesty going on (which I am part of) which is troubling me greatly. Here is what I mean, I am not singling out anyone else
- Constant changes to UL formulas. You are not supposed to change any formula with a UL listing. We often modify for flow, release, more/less flame retardant, etc.
- Data manipulation. I am often manipulating data (whether on my own or being asked) so that we meet a particular requirement or specification. We then make the product somewhat differently due to cost or application.
- Customer complaints. We often tell our customers stories which are not true in order to minimize the impact.

There are most likely more, but this is the crux of it. I don't know what an answer is, but (with advice from my pastor) I feel I need to share this with you. You may not even be aware of all of this. I appreciate, as always, your guidance.

Thanks,

████████████
Lucent Polymers
Technical Director

---

51.     Later that day, Kuhnash replied to the Technical Director, assuring that he would notify Jimerson of the problem and confirming that the problem should be "fixed":

Hi ▮▮▮
You are correct. I have no idea of this. Let's get this fixed. I think u should feel free to talk to Jason but let me talk to him first. I can only imagine that ▮▮ must feel same.
Thanks for sharing. I am sorry that u are in this situation. May not be an easy short term answer but we will find the correct fix. Stay strong buddy.
K

52.     The next day, on September 20, 2013, Kuhnash forwarded the Technical Director's email to Jimerson. Kuhnash's email included a typo in which he mistakenly told Jimerson "Pls do [*sic*] send the email to anyone or let [Lucent's Technical Director] know you have it."

53.     Less than two hours after receiving the Technical Director's warning of misconduct at Lucent, Jimerson immediately sought clarification from Kuhnash that they should not communicate further by email. Jimerson then acknowledged that he had the same "fears and reservations" as the Technical Director and confirmed that he and Kuhnash previously had discussed the same issues. He also suggested that the deceptive conduct could be discovered through ongoing due diligence by potential acquirers:

I assume you mean DO NOT let anyone see or have knowledge of the email. I'll discuss with him face to face. I too have similar fears and reservations about issues with CofAs, datasheets and the general grey area we are in sometime when it comes to product specs and formulations. You and I have discussed this previously. I absolutely understand his issues. I have an idea that could help with this issue and maybe put his mind at ease but it may require some level of approval if changes are made which could possibly slow down our processes. Let me discuss with him specifics around his concerns.

Also, I think he may be fearful of the process we are going though and the "deep dive" the next group might do into these issues from a technical standpoint. I assume from the email below it could make him look pretty bad.

**Jason Jimerson**
Lucent Polymers
Chief Operating Officer

54.     Kuhnash replied to Jimerson, agreeing that (a) they should not discuss Lucent's fraud by email or alert anyone else to the Technical Director's concerns, and (b) the Technical Director feared that a buyer's due diligence could uncover Lucent's deceptive practices:

Holy cow. Your assumption is correct. Do not send email.

I feel same in your assessment regarding his latent fears of the diligence process. Pls keep me informed. I would be pleased to join the talks when available. K

55.     As reflected by the email exchange in ¶¶ 50-54, by September 20, 2013 at the latest, both Kuhnash and Jimerson had been warned in writing about Lucent's deceptive business practices by Lucent's own Technical Director – *i.e.*, the person responsible for developing Lucent's formulas. And, according to Jimerson, he and Kuhnash had discussed those deceptive practices even before Lucent's Technical Director shared his "ethical/conscience issues" in his September 19, 2013 email.

56.     Despite knowing about Lucent's pervasive fraud and promising to fix it, Kuhnash and Jimerson took no action to stop Lucent's deceptive business practices. Nor did they take any steps to warn prospective buyers of the fraud. Instead, they took active steps to hide Lucent's practice of deceiving customers and evading UL requirements and, thus, Lucent's deceptive conduct continued unabated through December 2013 and beyond.

**The First Sale: Kuhnash and Jimerson Market Lucent to Citadel and Make Material Misrepresentations to Citadel in the December 2013 Stock Purchase Agreement**

57.     One of Lucent's potential buyers was plastics manufacturer Citadel. Shortly before the acquisition, Citadel had lost two head-to-head contests with Lucent due to Lucent's purported ability to sell flame retardant products at prices that some Citadel executives described as "ridiculously low." Citadel was interested in acquiring Lucent's low-cost production methods (*i.e.*, the "garbage to gold" business model) and applying those methods across Citadel's entire plastics business.

58.     Starting on September 10, 2013, Lucent marketed the potential sale to Citadel. Kuhnash and Jimerson participated in marketing the deal, meeting with Citadel

executives, and supervising the due diligence process. During the sales process, Lucent touted its purported "competitive advantage" – *i.e.*, its purported ability to use low cost recycled inputs. In at least one presentation, Kuhnash referred to this ability as Lucent's "secret sauce."

59.    On December 6, 2013, Kuhnash, Jimerson, and other major equity owners of Lucent signed a stock purchase agreement (previously defined as the "SPA"), by which all of Lucent's stock was sold to Citadel's wholly-owned subsidiary, Matrixx.

60.    In the SPA, Kuhnash and Jimerson falsely represented to Citadel that (a) each product manufactured and sold by Lucent was in material conformity with all applicable contractual commitments and warranties; (b) all items in Lucent's inventory were usable and salable; (c) Lucent had not materially breached or defaulted on customer contracts; (d) Lucent's financial statements accurately reflected the financial condition of the business, and all liabilities were recorded and reserved against; (e) Lucent's accounts receivable were not subject to any defenses, set-offs or counterclaims; and (f) Lucent was in compliance with all applicable laws.

61.    In making the false statements identified in ¶ 60, Kuhnash and Jimerson acted with scienter. At the time they signed the SPA, both Kuhnash and Jimerson knew, or recklessly disregarded, that (a) far from conforming with its contractual commitments, Lucent had been falsifying test data so that it could sell cheaper, non-conforming plastics to its customers, (b) a majority of the products Lucent sold were not "usable and salable" in that they fell short of applicable standards, (c) Lucent's financial statements – and, more specifically, its accounts receivable – did not reflect the liabilities that Lucent would incur if its customers found out that it was falsifying the results of its performance tests, and (d)

Lucent was not "in compliance with all applicable laws" because it was routinely defrauding customers though the pervasive use of false COAs and circumvention of UL processes.

62.     The misrepresentations that Kuhnash and Jimerson made in the SPA were material. A reasonable investor in Lucent would find it important that (a) Lucent could not reliably turn cheap recycled materials into plastic compounds that met stringent performance requirements and (b) Lucent was routinely faking compliance with performance standards by lying to its customers and evading UL testing and auditing procedures.

63.     Kuhnash and Jimerson each benefitted from the fraud. On December 6, 2013, when the sale of Lucent to Citadel closed, Kuhnash and Jimerson received payments of $518,597.15 and $19,606.58, respectively, for a portion of their stock.

64.     But that was not the end of Defendants' scheme. Kuhnash and Jimerson had two reasons to continue to hide Lucent's fraudulent business practices. First, a portion of the funds due Kuhnash and Jimerson from the December 6, 2013 sale were held in escrow. If Lucent's fraudulent business practices were discovered before the applicable deadline, Citadel could have halted payment of the escrowed amounts. The funds due Kuhnash and Jimerson were escrowed as follows:

**Amounts Due Jimerson and Kuhnash from the December 6, 2013 Lucent Sale That Were Held in Escrow**

|  | JIMERSON | KUHNASH |
|---|---|---|
| **Amounts Escrowed Until June 4, 2014** | $10,893.43 | $65,432.75 |
| **Amounts Escrowed Until May 11, 2015** | $14,123.12 | $84,832.25 |

| TOTAL ESCROW: | $25,016.55 | $150,265 |
|---|---|---|

65.    Second, even before the first sale closed in December 2013, Kuhnash and Jimerson were contemplating a second sale. When the sale of Lucent to Citadel closed, Jimerson and Kuhnash each received Citadel stock as partial compensation for their Lucent shares. By the time of the December 6, 2013 sale, Kuhnash and Jimerson already were planning to sell their new Citadel shares in the "next liquidating event."

66.    This two-sale structure was known to Kuhnash and Jimerson before they signed the December 6, 2013 SPA. For example, in a November 2013 email to Citadel, and cc'ed to Jimerson, Kuhnash inquired about the timing of the "next liquidating event." In another email to Jimerson in November 2013 about the upcoming sale to Citadel, Kuhnash wrote, "I am geked [*sic*] up about this. Good for all of us. The next liquidating event should be even better for us."

### Kuhnash and Jimerson Submit False Information to Citadel/Lucent's Auditor to Conceal the Lucent Fraud

67.    To ensure that they could receive the escrowed funds identified in ¶ 64 and sell their remaining stock in the "next liquidating event," Kuhnash and Jimerson continued to hide Citadel/Lucent's ongoing deceptive practices. To that end, both Kuhnash and Jimerson submitted false information to Citadel's auditor.

68.    In November 2013, Citadel hired an outside auditor ("Auditor A") to perform a year-end audit of Citadel's financial statements.  In January 2014, Citadel and Auditor A amended the engagement to include a year-end audit and an opening balance sheet audit for the recently-acquired Lucent.

69.     As part of its audit of Lucent's 2013 financial statements, Auditor A required

both Kuhnash and Jimerson to complete fraud questionnaires. In their responses to Auditor

A's questions, Kuhnash and Jimerson each falsely stated that he was not aware of any

actual, suspected, or alleged fraud that involved Lucent defrauding another company.

70.     Kuhnash and Jimerson did not disclose any information to Auditor A

regarding Lucent's falsification of performance test data, the submission of false COAs to

customers, or the evasion of UL testing procedures.

71.     Once again, Defendants' scheme to cover up the "garbage to gold" fraud was

successful. Kuhnash and Jimerson received all of the escrowed funds identified in ¶ 64

above. And, Citadel/Lucent found a buyer for the "next liquidating event."

**The Second Sale: Company 1 Buys Citadel/Lucent and Quickly Discovers the Fraud**

72.     In March 2015, Company 1, a publicly-traded plastics manufacturer, bought

all of the outstanding stock of Citadel/Lucent, including the remaining shares owned by

Kuhnash and Jimerson.

73.     As in the first sale, Company 1 hoped to acquire Lucent's purported ability to

manufacture high quality plastics from cheap, recycled inputs. Company 1 planned to

expand that capability to Company 1's other operations after the purchase.

74.     By March 2014, Kuhnash had left Citadel/Lucent. But, Jimerson still worked

for the company and was an active participant in marketing a potential sale of

Citadel/Lucent to Company 1. Jimerson did not disclose the "garbage to gold" fraud to

Company 1 prior to the close of that deal.

75.     Company 1's purchase of Citadel/Lucent closed on June 1, 2015. Company 1

paid $800 million for all of Citadel/Lucent's outstanding stock. Once again, Kuhnash and

Jimerson benefitted. At closing, Kuhnash and Jimerson were paid $725,636.76 and $604,322.93, respectively, for their shares.

76.    Overall, by hiding the Lucent "garbage to gold" fraud over the course of two equity sales, Jimerson and Kuhnash were able to maximize the value of their stock and liquidate the shares as follows:

|  | JIMERSON | KUHNASH |
|---|---|---|
| **Amounts Received at 12/3/2013 Close of Sale of Lucent to Citadel** | $19,606.58, | $518,597.15 |
| **Amounts Released From Escrow Relating to 12/3/2013 Sale of Lucent to Citadel** | $25,016.55 | $150,265 |
| **Amounts Received at 6/1/2015 Close of Sale of Citadel/Lucent to Company 1** | $604,322.93 | $725,636.76 |
| **TOTAL SALE PROCEEDS:** | $648,946.06 | $1,394,498.91 |

77.    Within nine weeks of the close of the transaction, Company 1 discovered the manipulation of test data and use of false COAs at legacy Lucent facilities. Company 1 immediately stopped all shipments of legacy Lucent products and conducted an internal investigation. Company 1 fired Jimerson in connection with that investigation.

**Company 1 Sues Citadel and Jimerson Lies Under Oath to Conceal His Fraud**

78.    After discovering the fraud, Company 1 brought a civil suit in Delaware Chancery Court against Jimerson, Kuhnash, other Citadel/Lucent employees, and the entities and individuals that sold their ownership interest in Citadel.

79.    As part of the litigation, Company 1's expert witness calculated Company 1's rescissory damages from the fraud at approximately $272 million.

80.    During the Delaware Chancery case brought by Company 1, Jimerson testified in a deposition and at trial.

81.    At the time Jimerson testified, Company 1 had uncovered the September 19, 2013 email – identified in ¶ 50 – in which Lucent's Technical Director warned Kuhnash about Lucent's manipulation of test data, changing of UL formulas, and "telling stories which are not true" to customers.  But Company 1 had not yet located – and, therefore, could not confront Jimerson with – the subsequent emails in ¶¶ 52-54 confirming that Kuhnash had shared the Technical Director's September 19 email with Jimerson.

82.    At his January 19, 2018 deposition in Company 1's civil suit, Jimerson falsely testified that he had no knowledge of Lucent's "garbage to gold" fraud before the June 1, 2015 sale of Citadel to Company 1. Specifically, Jimerson falsely, and adamantly, denied that he had ever seen the September 19, 2013 email from Lucent's Technical Director regarding Lucent's fraudulent business practices. Jimerson suggested that he would have fired the Technical Director had he known of the fraud, testifying that, had the Technical Director shared his concerns regarding the manipulation of test data, "he would have been jobless."

83.    Jimerson repeated this story on April 19, 2018 when he testified under oath at the trial of Company 1's claims in Delaware Chancery Court. At trial, Jimerson was confronted with the September 19, 2013 email from Lucent's Technical Director. Again, Jimerson falsely denied that he had seen the email or otherwise discussed the deceptive practices identified therein:

Q. At any point in time did Mr. Kuhnash raise any of these concerns from Mr. ███ with you?

A. No. No. Nothing like this

\* \* \* \* \*

Q. And, Mr, Jimerson, before August 2015, again, were you aware of employees routinely putting inaccurate information on CoAs' data --

A. No.

-- at Lucent?

A. No.

Q. Before August 2015, were you aware of any failures to comply with UL requirements?

A. No.

84.    Just like he did in his deposition, Jimerson indicated at trial that – had he known of the Technical Director's concerns – he would have intervened and stopped Lucent's fraudulent business practices. Specifically, Jimerson testified that – if he had known about the manipulation of test data and falsification of COAs to customers – he would have "shut it down."

85.    On December 5, 2018 – after the emails confirming Jimerson's knowledge of the "garbage to gold fraud" came to light – the Parties in Company 1's lawsuit informed the court that they had reached a settlement on all of Company 1's claims. The terms of the settlement were not publicly disclosed.

**Kuhnash Pleads the Fifth During the SEC's Investigation**

86.    On August 30, 2018, the SEC subpoenaed Kuhnash to provide testimony under oath as part of the SEC's investigation of the conduct described above.

87.    At his November 9, 2018 investigative testimony, Kuhnash refused to answer any of the SEC's substantive questions and invoked his Fifth Amendment privilege against self-incrimination.

**COUNT I**
**Violations of Section 10(b) of the Exchange Act,**
**and Exchange Act Rule 10b-5**

88.    Paragraphs 1 through 87 are realleged and incorporated by reference.

89.     As more fully described in paragraphs 23 through  87 above, Defendants Kuhnash and Jimerson, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers  of securities.

90.    As described in more detail in paragraphs 23 through 87 above, Defendants Kuhnash and Jimerson acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

91.     By reason of the foregoing, Defendants Kuhnash and Jimerson violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

### Violations of Section 17(a) of the Securities Act

92.     Paragraphs 1 through 87 are realleged and incorporated by reference as though fully set forth herein.

93.     By engaging in the conduct described in paragraphs 23 through 87 above, Defendants Kuhnash and Jimerson, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly have:

a.    employed devices, schemes and artifices to defraud;

b.    obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

94.     Defendants Kuhnash and Jimerson intentionally or recklessly engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

95.     Defendants Kuhnash and Jimerson also acted, at least, negligently in engaging in the conduct identified in ¶¶ 23 through 87 above.

96.     By reason of the foregoing, Defendants Kuhnash and Jimerson violated Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants Kuhnash and Jimerson committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants Kuhnash and Jimerson, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants Kuhnash and Jimerson to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

Issue an Order imposing upon Defendants Kuhnash and Jimerson appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting Defendants Kuhnash and Jimerson from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78*l*) or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**VI.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

February 12, 2019                    By: */s/ Robert Moye*
                                     Timothy S. Leiman (leimant@sec.gov )
                                          Trial Counsel
                                     Jake Schmidt (schmidtj@sec.gov)
                                          Co-Counsel
                                     Jeffrey A. Shank (shankj@sec.gov)
                                          Co-Counsel
                                     Robert Moye (moyer@sec.gov)
                                          Co-Counsel

Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*